Good morning again. May it please the court. This case presents both a number of issues which are on plain air review and also presents a question of cumulative error based on a number of errors. I have a lot of questions for you so can I just go here. First off, there's a concession I think that some of the conduct is inappropriate here. But the question that I have is obviously defense counsel in the impeachment about is the person lying and all of that. Are you then saying that the officer would be lying? Well, defense counsel in opening statement says that the cops are lying or the MPs or whatever as far as that goes. So that's clearly what the defense is. And then these questions are asked and the defense counsel doesn't object so we have to review for plain error. And they're conceding that they were inappropriate questions. I don't know what the lawyers were doing here. Whether they were potted plants or whatever. And then you've got this whole line of questioning about the officers being exonerated in this internal investigation. No objections to that. In my view, clearly as a former trial judge, it clearly wasn't admissible. If anyone had asked to keep it out, I think most judges worth their salt in that would have kept it out. But the other hand is you don't jump in and make those objections for the lawyers. You'll let them try their cases. So there's no objection here as far as that goes. So at the end we have to assess all this for plain error. And the theory of the defense case is that the cops or the MPs are liars anyway. So how is this really going to make a difference to the jurors anyway? Everyone's putting it out there that they're liars. And then we've got two cases. There's a just on case, I think, and Combs. Well, it's just on Combs demonstrate, I think, beyond any question that these kinds of errors are serious errors and will be recognized as plain error. And then when you look at the cases that weren't reversed on plain error like Ramirez. So in Ramirez, three questions were asked. And there was a redirect question on the subject, which suggested to the court that maybe there was a strategy here. I think there's no questions. There's no strategy. I mean, if one looks at the record, it's clear that defense counsel spent more time trying to withdraw from the case the week before the trial than doing anything else. And as I was saying to Mr. Tong before the argument, this is a typical situation. You have an aggressive, young special assistant assigned to this case. He's long gone. We don't see him here today. Instead, they bring an entirely reasonable fellow, Mr. Tong, to try to explain what happened. And so you have Mr. Caldwell, who thinks he's fixed upon some rhetorical flirt, some flash of genius that's been overlooked by every other lawyer that tried a case in the last 50 years. And instead of going and asking somebody about doing this or doing a little legal research and finding the Combs case, he just goes ahead. And I have to agree with the court's suggestion that defense counsel failed to do what defense counsel is supposed to do. But nevertheless, we have 15 times the government's lawyer asked Harrison to confirm that a government witness had made up his or her testimony. We have 10 times the government's lawyer asked Harrison to confirm that a government witness was lying. Four times the prosecutor asked Harrison whether the government witness or the special assistant himself was conspiring against him. But then you also, before this happened, you have the defense attorney in the opening statement saying that they're liars anyway. So how is, you know, I guess the whole thing is right front and center, is we've got, you know, the prosecutor's going to call Mr. Harrison a liar, and the defense is already, they start with, we're calling the officers a liar, and the jury's going to have to decide. Right. And that's the jury's job, to decide. Which makes it very hard for the district judge, because here's a defense lawyer, and he has told the jury, these guys, that's a strategy, you know, these guys are lying. And you're sitting there as a trial judge, and you're saying, gee, this looks fishy to me, but do I want to interfere? Because this may well be a strategy. The defense lawyer may well want to have his client there on the stand, reiterating for the jury that, yes, those guys are lying through their teeth. The problem with allowing... And you know, you get caught either way. You interfere, and then they say, well, you're tying the case with the lawyers, you're interfering with the defense lawyer's strategy. Well, I think the trial judge, faced with that dilemma, and assuming the knowledge of the matter that we all have right here, could say, will you two gentlemen please approach the bench here? It's kind of like the whole case is like the game that couldn't shoot straight. I mean, it's a very factual predicate. Well, and I'm wondering, did I read this correctly, about that the officer chambered the gun during the assault? So the officer was essentially out there with a gun that wasn't loaded, ready to go? I'll tell you the truth, I'm not 100% certain of the record on that one. I think the officer did chamber it around. So essentially you're carrying a gun around, and everyone thinks that you're armed, but you're really not until you chamber it? I think that's the standard way in which law enforcement officers... Oh, I don't think so. It can be done pretty quick. Yeah, that's right. It's pretty quick with an officer. Although Judge Callahan does know a lot about law enforcement officers. Well, it's just, I don't know why you'd want someone to think that you're armed, but you're really not. Well, she also had a police dog as well. Right, yeah, the police dog was really only a drug dog that didn't follow commands, so... These were MPs, these were not city cops. That's right. And they may well operate by different rules than city cops. Yeah, but I... Okay, so the argument is, even if I think that this is just, that it's conceded error, the prosecutor was, but it's proclaimed error, that it's just done in combs because it's Ninth Circuit precedent, that ties my hands in terms of that I would have to say that it was reversible based on that. I think so, because there's nothing to suggest any reason to believe this is a tactic to allow these questions. And credibility is frequently an issue in many cases, but it's an issue for the jury to decide. It's not an issue for one witness to comment on another witness's credibility. That's the vice of this sort of questioning, because instead of living to a jury, hey, you saw these people testify, you observed their demeanor, you decide, you know, there's arguments on each side. The government argues why Mr. Harrison shouldn't be believed. Harrison's lawyer argues why these MPs shouldn't be believed. Neither argument should turn upon this witness himself was required to testify as to what other people were doing in terms of being mistaken or lying or whatever, because then it puts the witness into a place that the witness should never be. Witnesses aren't. Their testimony on what they think about someone else's credibility is irrelevant. Well, let me take you to the Chapman, the jury instruction error. Now, this involves the assault on the female MP. That's right. Now, the law changed after the trial, but in time for the appeal. Right. So, is it my, am I correct in the way that the jury was instructed that it was in the disjunctive and they could have believed that, they could have convicted on the basis of resisting or a threat, but now the law requires the actual assault or... Right, or ability to have the... And so that's why it would be prejudicial error on that, because we can't tell from the way that it was instructed what the jury actually concluded, and it could have been one of the impermissible... Right, it could have, it was disjunctive instruction of assaulting, resisting, or intimidating. And so if it were resisting or intimidating, that now would not satisfy the law. That's an error under Chapman, right. Okay. The, in addition to the improper cross-examination, there was a vouching in the case, and vouching is another problem that seems to recur and seems to recur in these records more often than it should, and the court has been pretty firm about not endorsing it. And since this case, this case boiled down to a credibility contest. There was three people who were present at the scene. Two of them were MPs and one was Mr. Harrison. So... There was the injury, right? That was not just... Well, the injury was consistent. The testimony about the injury, there was testimony about injury, but the injuries were consistent, so the circumstantial evidence was consistent either with the version testified to by Harrison or the version testified to by Kirby and Jenkins. So it didn't tell the tale. Which points me exactly how expensive it was Harrison. What Harrison said was that Kirby, excuse me, Jenkins, I think, tackled him, and they both fell to the ground, and the... And he fell on his eye. There was testimony about... I mean, it's just sort of... He hit his eye against the ground. Well, there was no testimony about any eye injury. What there was was testimony about a bruise that couldn't be seen in any photograph that's introduced, and there was testimony about the nature of the bruise that was... Okay, that's your explanation, but let me kind of further refine this for you. Since we have to assess the strength of the evidence, and admittedly credibility is certainly part of the issue, would you concede that the case involving the male MP is a slightly stronger case because of the physical injury than the case involving... You have to give inferences in favor of the verdict on that. So would that be a slightly stronger case than the other case? I would say it is slightly stronger, but the problem is... I'm not asking you to admit that it's overwhelming. I'm just saying, you know, if we... Isn't a little stronger evidence there? I would say it's a little stronger, but it's also the case that the photograph that's introduced is actually inconsistent with the claims of the bruising because it's invisible. And there was testimony about how come a photograph doesn't show what everyone thought would be shown by taking the photograph. Didn't Roberts testify that there was bruising around the eye? He may have done, yeah. Okay, so... We have an additional... Oh, excuse me, go ahead. I mean, that is evidence. Yeah. So we have a witness, somebody who was there, says, Jenkins had a bruise around the eye. This is where I got the eye reference. He said that it fell, and it fell on the eye. It fell? On the cheek. Well, he said around the eye, you know. Yeah, I mean... Around the eye. I would distinguish between a bruise on one's cheek here and the eye itself being... He says Roberts... Didn't Roberts testify he saw swelling around Jenkins' eye? Right, which is a bruise on the cheek. That's what I thought it meant. Well, I understand, but you can understand where a juror might see the same eye as eye, right? Well... It could be the lid. I mean, it didn't say we saw, you know, the eye punctured or, you know, some eye fluid running out of the eye. They said there was swelling around the eye. Yeah, but usually if one's talking about... It's the kind of thing that you usually get when you get a punch in the face, right? Well, my experience... Not that I know from personal experience, but... Well, my experience is you get a black eye, but it's been a long time ago and I don't choose to repeat the experience, but... The other... Well, I'm sorry. I had to pass the point, but you can get a black eye if it is a certain kind of injury, but if you get hit in the face around the eye, swelling would certainly be... And maybe it's not sufficiently severe to cause a black eye or to go immediately... Doesn't a black eye show up the next day anyway? Yeah. Well, the first thing you would get is to see a swelling. Well, the reason I think that it has to do with the cheek is because the testimony about the photograph that's introduced that didn't show anything was about looking at the point on the photograph where the guy's cheek was shown, the upper part of the cheek or the lower eye's orbit, I think that's what it's called. So to make this consistent with Harris's testimony, somewhere in the scuffle... There's a scuffle and both fall to the ground. So that would be consistent with getting some kind of injury around the face. There's a couple of additional errors here. One is that count three, which didn't even state a crime, shouldn't have been tried at all and was tried, and that allows some significant evidence to come in about what happened the next day. Do you mind, was there a motion to dismiss on that one? Once we were appointed to the case post-verdict, we filed a motion to dismiss, and the district judge did dismiss. But that would not have cured the problem of just saying, you know, the count should not even have been in there during the trial. Well, I think it would have cured the problem because it was dismissed as a matter of law based on it not stating a crime under the Submitted Crimes Act because it wasn't actually an offense as defined under Hawaii law, the offense of terrorist threat. I have no idea what you just said. That's because the MPs didn't qualify as people that could have under the statutory language, correct? That's right. The MPs are not the people that are protected under the Hawaii definition of law. But really the incident that was testified to from the initial contact until he was finally taken into custody after calling his car and stolen and all of that, that would not, the fact that that was eliminated, it wasn't that all that evidence was going to come in. Well, that evidence was coming in, but the terrorist threatening involved the next morning when he was being released, that was what that is that was involved. It was a different MP involved, and it was separated in time and place from the incident that took place on the beach. So a lot of, so most of that evidence wouldn't have come in because it was irrelevant and it seems to me doubtful that it would have come in under any other theory of 404B or otherwise. Right. If the motion to dismiss doesn't come to the trial, you can't undo the evidence that came in during the trial when there was no motion to dismiss that count, right? But if you're looking at whether this plain error ought to be recognized because it substantially injured the defense. I understand that you have a plain error argument on that, but it's one of those situations where the judge could really have cured the problem if it had been brought to his attention. I mean, this is one of those situations where a lot of times you say, well, we don't know whether, you know, you make an objection, rather than Google what effect it would have had, but here had an objection been made, a time of objection been made, we would know whether all that stuff would have come in or not because Well, that's all true, but on the other hand, one might as easily say that if the prosecutor would charge crimes that actually were crimes, the issue wouldn't need to be brought to the court's attention. Well, if everyone would read the code, that would be nice. I think that as we stand here, all I can say is that as far as I can tell, Mr. Tong and I are blameless in this matter, but nobody else that was involved in the trial, and neither of us were, is. And quite frankly, I think you could apportion the blame fairly equally between the two. This was appointed counsel? Retained counsel. It was retained counsel, right. You're both playing what's called clean up. Exactly. But I think the way to clean it up is to reverse it and send it back for a new trial. Thank you. Okay, thank you. How did the lawyer leave the case, by the way? After... How did your office get involved? After the trial, the defendant changed counsel, and he had a new retained counsel, and for a little while, and then that person left, and then he submitted an affidavit and the court reviewed it and appointed our office. He's got another lawyer long enough to spend all the money so he could qualify for something really good. I think it might have been that there was some talk about payment and there was a quarrel about what was agreed, and I don't know all the ins and outs, and the record doesn't show one way or the other, and then we were appointed. Okay, thank you. Okay, we'll now hear from a very reasonable Mr. Tong. Thank you, Your Honor. I'll do my best to live up to... Was that vouching by the public defender? I hope it was particularly persuasive to the court, it was. I feel compelled to start by, again, repeating the concession, which is very clear to the court that the questions that were posed by the prosecutor here clearly were improper. We admit to that. We concede that. We made that clear in our brief. Mr. Tong, it's not just the questions themselves, but I have to say the number of questions here is grinding. I reread that testimony again today, and I started counting. I came up with a little different count than Mr. Wolf came up with, but I counted 26 questions. I didn't try to divide them into subcategories, but I counted at least 26 questions, which is a very, very substantial number. This was just pounded and pounded and pounded that he was telling him that every one of these officers had gotten on the stand and had lied. Well, the word lie was used quite repetitively. I agree it was used excessively. I agree it shouldn't have been used at all. I also agree with Mr. Wolf that had a different defense counsel been there and objected, it probably would not have been used as many times. But I think the essence of our theory on appeal is captured by Judge Callahan's comments, or at least she's embraced it for purposes of being a devil's advocate, which is that on plain error review, we have to look at the strength of the government's case. We have to look at whether or not the errors that we are talking about now affected the defendant's substantial rights, whether or not they materially affected the outcome. Well, I think we also have to look at, I don't actually think that they mattered, to be honest. That's only reflecting my view. But my concern is Ninth Circuit precedent in terms of could I distinguish jest on and combs. I think ultimately this is a very fact-specific inquiry, and ultimately that's why I think the Court's inquiry has to be into the strength of the evidence of the government's case. As Your Honor has pointed out with regard to the first count, which is the most serious assault, this is not a one-on-one situation where it was a he said, she said. This was a situation where the victim of the assault testified, I got punched in the face. MP No. 2, the woman MP, Ms. Jenkins, she said, I saw the defendant punch MP No. 1 in the face. Both of them said he was acting in a drunk, boisterous, combative way. That was corroborated by the two other witnesses that came upon the scene, one the HPD officer, the other being the other Army investigator, both of whom essentially said this man was drunk. It was plain to us he was drunk. He urinated on the highway. He was so drunk that he donned a garbage bag as a shirt when he ran away, and he was combative even in the events after he was apprehended and arrested. His demeanor that evening, his drunken rage, was entirely corroborative of the assaultive conduct that was testified to by the first two MPs. I think that's a very, very strong case. It consists of direct evidence of the assault, corroborative evidence in the form of his demeanor, and, of course, the evidence that there was an injury. Now, granted, the injury to the eye, whether it be the eye or the orbit under the eye or the cheek, was not overly dramatic, as Mr. Wolfe has pointed out. So would you concede then that, as I asked the appellant's counsel to concede, saying that the assault against the male MP was stronger, would you concede that it was weaker, the case was weaker involving the female MP? Without a doubt. I still think the strength of the evidence is considerable as to count two, but without a doubt the evidence was stronger on count one, standing in isolation. But, of course, the jury in deliberating on this case has to look at each count individually, but they certainly can look at the pattern of conduct, use common sense and reason in evaluating the credibility of all the witnesses, and basically assess what really happened that night. And to me, one of the most powerful- Well, either they believe his version or they believe their version. It was sort of hard to split the baby and say, yes, he punched one, but- They could have come with a split verdict if they wanted to. Well, certainly the law would allow for that, and one has to presume they followed the jury instructions, which said you must consider the evidence as to each count separately. But my personal belief- But if they disbelieve him as to the one, chances are not very good they're going to believe him as to the other. So here's the testimony to have silence, essentially. Once they decide he's not telling the truth about what happened, it becomes much more tenuous. I guess split verdict is the only way possible, but as a practical matter, not likely. As a practical matter, I would agree with Your Honor, in part because of the tact that the defense took. As Your Honor, Judge Callahan pointed out, from the get-go, the theory seemed to be, even if the word lie wasn't used in open statement, the theory seemed to be these young MPs overreacted, and one didn't have a round chambered in her weapon when she was on patrol, but they overreacted. And then they did everything possible to cover it up. And from the get-go in his testimony, he said, look, I had been drinking that evening, but I was not drunk. I was sober. These people overreacted. And then that was inconsistent with all of the evidence presented by independent witnesses who came to the same conclusion. So I would agree with Your Honor, Judge Kozinski, that the likelihood is once the jury rejected his credibility, there was little likelihood they would believe him as to any of the material evidence. Was the AUSA alone in the courtroom? There was no one else from your office present to observe this and pull him back? Your Honor, this is, if I may step slightly outside the record, in answer to your question in the record, there were two special assistant United States attorneys present in the courtroom. Both of them were military officers who were serving temporary tours of duty in our office with the primary responsibility of prosecuting offenses on military basis. The part that is outside the record is that, like I think many U.S. attorney's record offices, if I may, use special assistant U.S. attorneys to do primarily traffic offenses and other misdemeanor cases. This was a felony case being handled by two special assistants alone in the courtroom. And again, I go back to say that on appeal, reading the cold record, just as Mr. Wolfe is doing and just as Your Honors are doing, I am the first to agree that this was not a model of how a case should be prosecuted. Well, I mean, getting the prior conclusions that they didn't do anything wrong in. I couldn't agree with Your Honor more. I think ultimately, being the reasonable guy that apparently Mr. Wolfe thinks I am, I just have to say that on the record, for plain error review, I think that the conviction should be affirmed. I do not in any way personally condone nor would I suggest that any of my colleagues question a defendant in the manner in which the questioning here occurred. Well, let me ask you, though, on the instructional error or the chapter case coming in. It seems to me that, you know, how can I tell from the female MP as Jenkins? Yes. No, no, I'm sorry, Your Honor. It's Kirby. Kirby. Okay, Kirby. Thank you. She was a little bit equivocal and had a little more difficult time remembering certain things in terms of when she called her dog, she said, well, I wouldn't have called my dog if I hadn't felt threatened. You know, I'm not sure exactly what happened there, but she had a little, her memory was not quite as clear on certain issues. But it seems to me the way the jury was instructed at the trial, that they could have convicted Mr. Harrison of resisting or threatening, and there would be no way that we would know that, and now we know that the law requires it can't be resisting or threatening. So how do we get, how is that error harmless? If I may first answer your question, I think Chapman does not say that resistance or intimidation can no longer be a misdemeanor assault under the statute. It says in order for resistance or intimidation to constitute an assault, the conduct also must meet the common law definition of simple assault. So there had to be additional elements as to which the jury was not instructed. Under the law, I believe it's the Perez case, we need to look at the strength of the evidence on the omitted elements, and then essentially on plain error review, which it is here, we have to decide whether or not the jury could reasonably have convicted and found the missing elements. It's a bit of voodoo to me, but that's the posture we're in, simply because it is plain error review, and none of the parties here, whether it be the government or the defense or Judge Ezra, could have anticipated the change in the law that occurred after the trial, but while this appeal was pending. See, if it were the facts of the first one, no problem, and they're not contending that, because that was, if you believe anything happened, he got hit. Right. But there's other activity with the running of the dog, you know, there's... Right. There absolutely was confusion in the dark in the bushes, and I think that her memory is reflective of the fear that she felt in confronting this drunken rugby player in the dark, who had shown a boisterous demeanor such that he was willing to attack an armed officer and punch him in the face. I think that alone, that evidence shows one of the missing elements, which is that she reasonably felt fear for herself.  I would repeat the evidence that I just referenced. It is true that she was an officer. It is true she had all of the paraphernalia of a law enforcement officer, to include a gun that was loaded that was pointed at him. Could she have killed him? Yes, I'm sure she could have. Does that mean she couldn't fear for her own safety? I submit not. Does that mean that he didn't have the present ability to harm her? Again, I would submit not. I think the jury's verdict on the other counts shows that they believe that in the state he was in that evening, he was capable of inflicting harm even on an armed officer, as he had demonstrated with regard to his assault on the first officer. As I say, it comes to the court and to us, frankly, as advocates, in a posture that is difficult to argue. It's almost like a law school hypothetical. What would the jury have found had it been told what the law was if the court had known what the law would be at the time of the appeal? It's a difficult construct, but one that we're left with, and I submit that the evidence and the jury's verdict on the other counts is sufficient to show that they probably would have found the missing elements, as reflected by count three, which was later dismissed. Is it probably? I think, frankly, Your Honor, I don't believe the cases say more probable than not. I think they just say, could the jury reasonably find? It almost seems like a review akin to sufficiency, but not as deferential. But I would point out that as to the count that ultimately got dismissed, that was count three, and that had to do with post-arrest conduct. When the two MPs confronted Mr. Harrison, the defendant, after he had been apprehended, and even though he was handcuffed and in restraints, he continued to struggle, continued to fight, continued to have this verbal tirade laced with profanity, and the jury, when instructed on Hawaii law as to that point, found that even though he was handcuffed, he had the ability to carry through on his threat, to cause them to fear for their own safety in a reasonable fashion. I think that shows that had the jury been asked to find the same elements as to count two, they would have made such a finding. And if I may, very briefly, I see my time is starting to run down. Mr. Wolfe talks about count three being related to events that occurred on the following day. That is technically true, but I think it's only separated by a couple of hours because the first event occurred late in the evening of the preceding day. He was then apprehended in the early morning hours on the next day. So the temporal proximity is still there, even though on a calendar basis, in fact, it was the next day. And I believe I have tried in our brief to address each of the incidents that Mr. Wolfe has raised. I'm happy to address any of those if it would be useful to the court, but otherwise it's very apparent to me the court has studied the briefs closely and I'm prepared to submit on the remaining issues. Thank you. Thank you. Mr. Wolfe, would you like to take a minute for a button? Yes. On the cross-examination issue, both Combs and Gaston were plain error cases. In Combs, this court stated that because witness credibility was paramount and the agent in that case, Agent Bailey's testimony, was, quote, critical, possibly determinative, it was, quote, fundamentally unfair to compel Combs to impugn the veracity of Agent Bailey's testimony by pitting Combs' credibility against Agent Bailey's. If that was where the credibility of the defendant was pitted against one agent, here it was against five of the six government witnesses. Gaston, the court held that the error of the questioning was reversible plain error because the defendant's, quote, fate hinged on resolution of the conflicting testimony presented by the parties. And this court stated in a case where witness credibility was paramount, it was plain error for the court to allow a prosecutor to persist in asking witnesses to make improper comments upon the testimony of other witnesses. Gaston involved pitting two defense witnesses, not the defendant, against government witnesses. Finally, as to the instructional question, the problem is not that the element was omitted. It's that it was over-inclusive. So I think that the cases that say that when you have an omitted element that wasn't contested, you can examine whether it would have been found anyway is not applicable. What we have here is an element. It wasn't omitted. It was just over-inclusive at the jurisdiction. I'm not sure what it means over-inclusive. What's that? What does over-inclusive mean? Because it allowed conviction of Mr. Harrison not only if he assaulted Agent Kirby, but also if he resisted her or intimidated her, and Chapman tells us that in the latter two instances that's not enough. So the jury... He could have convicted him based on just that he resisted. That's the problem, exactly.  That's right. That's right. And the problem, though, is not that that element was omitted from the instructions. It's that the element, as instructed upon, was allowed conviction on a too broad a basis. Thank you. Okay, thank you. Case resolved. You'll stay a minute.
judges: Kozinski, Bybee, Callahan